RICHMOND DREDGING CO. v. STANDARD AMERICAN DREDGING CO. et al.

(Circuit Court of Appeals, Ninth Circuit. October 31, 1913.)

No. 2,208.

1. ADMIRALTY (§ 6*) — JURISDICTION — VESSEL SUBJECT TO MARITIME LAW — DREDGE.

A hydraulic dredge 75 feet long and 30 feet beam, having a superstructure containing a pilot house, galley and quarters for the crew, and machinery, built to operate afloat and not otherwise and capable of making ocean voyages, is subject to the maritime law, and contracts for her hire are within the admiralty jurisdiction.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 86–98; Dec. Dig. § 6.*

Admiralty jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347; Boutin v. Rudd, 27 C. C. A. 530.]

2. SHIPPING (§ 39*)—CHARTER OF DREDGES—CONSTRUCTION.

A contract by which libelant leased a dredge to respondent and respondent at the same time leased another one to libelant, construed with respect

---

to its provisions for termination of the leases, and *held* to entitle libelant to demand the return of its dredge on complying with a demand for a return of respondent's.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

**3.** SHIPPING (§ 39*)—CHARTER OF DREDGES—CHANGE OF EQUIPMENT BY CHARTERER.

Where the lessee of a dredger to fit it for heavier work removed therefrom two engines which operated its machinery and temporarily installed others which it hired for the purpose, the latter did not become a part of the craft or its equipment and as such the property of its owner, but the lessee on termination of the lease was entitled to remove them and replace them with those in use when the lease was made.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

Appeal from the District Court of the United States for the First Division of the Northern District of California; John J. De Haven, Judge.

Suit in admiralty by the Richmond Dredging Company against the Standard American Dredging Company, California Reclamation Company, and Atlas Gas Engine Company. From a decree in its favor, libelant appeals. Affirmed.

This is a libel in admiralty originally instituted against the dredger Richmond No. 1 and the Standard American Dredging Company to recover the possession of the dredger, her machinery, equipment, etc.

Among other things, it is alleged "that said dredger Richmond No. 1 is a vessel consisting of a hull and superstructure, containing a galley and cabin accommodation for her crew, also all machinery necessary for and usual in an hydraulic dredger; that the said dredger Richmond No. 1 is built to operate afloat and not otherwise, and during all the times herein mentioned has been and now is operated afloat and is equipped to navigate upon the ocean and other navigable waters."

It is further alleged that the Standard Company has wrongfully withheld the dredger from libelant since August 15, 1910, under a claim which it predicates upon the provisions of certain charter parties, but which claim has no foundation in fact. The charter parties referred to are three in number. The first bears date February 10, 1909, by the terms of which the Standard Company rented from the Richmond Company the dredger Richmond No. 1 for a period of not less than four months, and for as long thereafter as the Standard Company might desire the dredger for work in Lake Merritt.

The second was entered into October 18, 1909, between the same parties, which stipulated for a renting of said dredger to the Standard Company for a period of time running from October 19, 1909, to January 20, 1910, at a rental of $800 per month, the lessee to return the dredger "to and in the canal at Richmond in as good condition and repair as same now is, viz., in condition to immediately start work, reasonable wear and tear and loss or injury by fire excepted."

The third charter party of date February 26, 1910, was also between the same parties, the Standard Company however being the first party, and the Richmond Company the second. The provisions so far as pertinent are as follows:

"1. The party of the first part hereby lets and leases unto the party of the second part and the party of the second part hereby hires and takes from the party of the first part the said electric dredger Oakland to be used for the filling of the said lands, at and near Richmond, California, for the term of sixty (60) days from and after this date, at a minimum rental of eight hundred dollars ($800) a month which shall pay for the use of said dredger Oakland not more than one shift, not exceeding twelve (12) hours each day; and if at any time during said term, said dredger shall be operated more than

---
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

(12) hours in any day, the party of the second part shall pay the party of the first part an additional rental at the rate of eight hundred dollars ($800) a month for the extra time of operation."

"7. In consideration of the execution of this agreement, all claim of the party of the second part to increased rental, or other charge, by reason of the detention of the Richmond No. 1 beyond the term of the said charter, is hereby waived; and the term of said charter, as modified by this agreement, is hereby extended, at the rental of eight hundred dollars a month, for the term of sixty days from this date, and for such further time as shall be fixed and determined as hereinafter provided; and the rental of said dredger Richmond No. 1 to be earned, shall be applied as an offset to the rental of the dredger Oakland as far as it will go.

"8. If at the expiration of the said term of sixty (60) days the party of the first part shall not have found any other work that it desires to do with said dredger Oakland, this agreement may, at the option of the second party, be extended thereafter until the party of the second part shall have completed such amount of filling as may be desired by the party of the second part on the lands aforesaid, not exceeding a total of 400,000 cubic yards of material including the filling that shall heretofore have been done by the use of said dredger Oakland, under this agreement, or until the party of the first part shall have given the party of the second part fifteen (15) days' notice of termination of this agreement.

"9. If at any time during the term of this agreement, or any extension thereof, the party of the first part shall secure work which it desires to do by the use of said dredger Oakland, it may, at its option either require the party of the second part, after fifteen (15) days' notice in writing to operate said dredger Oakland twenty-four (24) hours each day until 400,000 cubic yards of filling (including all filling previously done by the Oakland) shall have been completed or to terminate this lease of the said dredger Oakland by giving the party of the second part (15) days' notice of such termination, and returning the dredger Richmond No. 1 to the party of the second part as in said charter provided, or paying the party of the second part at the rate of fifty (50) dollars a day for the said Richmond No. 1 for all time it shall be retained by the party of the first part after the expiration of said fifteen (15) days' notice, and the return of the Oakland to the party of the first part.

"10. It is hereby mutually agreed and understood that the rent of said dredger Richmond No. 1 shall be eight hundred (800) dollars per month, and that the said first party shall have the right to lease and use said dredger Richmond No. 1 at any and all periods when not in use or required by the party of the second part until January 1, 1911."

It is further averred that the Standard Company terminated the latter charter party as to the dredger Oakland on August 12, 1910, and demanded a return thereof, and that in accordance with such demand the Richmond Company on or about August 14th returned said craft; that thereupon the Richmond Company became entitled to the return to it of the dredger Richmond No. 1; and that on August 16th, and again on September 2d, the Richmond Company demanded of the Standard Company the return of such dredger and was refused. The libelant claims damages for withholding the Richmond No. 1 at the rate of $50 per day from the date of demand, and an attorney's fee of $300, which it is claimed was incurred in a prior endeavor to recover said dredger.

The Richmond No. 1 had installed upon it at the time of filing the libel two Atlas gas engines for operating the dredging machinery. The Standard Company filed a claim claiming to be entitled to the rightful possession of the dredger as bailee and executed a bond for its release from the attachment, conditioned that the claimant "shall answer, abide by and perform the decree of this court, and return the said dredger in the same condition in which she now is and in good repair, and shall pay all damages which may be sustained by reason of the detention of said dredger."

The Atlas Gas Engine Company filed a claim to the ownership of one of the Atlas gas engines installed upon the dredger, and the California Reclamation Company filed a claim for the other.

Later libelant filed a supplemental libel setting forth other and further and separate causes of relief:

First, that libelant is entitled to damages under the bond of respondent for detention of the possession of said dredger in the sum of $50 per day, aggregating $9,400 to the date of filing the supplemental libel.

Second, that libelant is entitled to damages in the sum of $10,000 for loss sustained under a contract with Orlin Hudson as superintendent of streets of the city of Richmond, which it was unable to perform on account of the withholding from it by the Standard Company of the possession and use of the dredger Richmond No. 1, of which contract the said Standard Company had knowledge and notice when it entered into the charter party of February 26, 1910.

Third, that after gaining possession of the dredger under the bond the Standard Company removed therefrom the Atlas gas engines then installed therein, which were of the value of $10,000.

Fourth, that the Standard Company wantonly and maliciously deprived the libelant of said dredger to the latter's damage in the further sum of $5,000.

Exceptions to the second amended libel and a motion to strike were denied by the court, but exceptions were sustained to the second and fourth clauses of relief preferred by the supplemental libel.

The Standard Company by its answer admits the execution of the charter parties as alleged, and the proceedings had in court in pursuance of the libel, including the execution by the Standard Company of the bond, and its resuming possession of the dredger by virtue of said bond and the order of the court. And it alleges, among other things, that on or about February 3, 1911, it tendered the dredger to libelant in the canal at Point Richmond in as good order and condition as it was when received, reasonable wear and tear thereof excepted according to the terms and provisions of the charter party of February 26, 1910; that the libelant refused to accept the dredger; and that by reason thereof the Standard Company has since been required to maintain a watchman upon it at an expense of $100 per month, which amount it claims libelant should repay.

The cause being submitted upon the evidence, the District Court decreed that libelant was entitled to the dredger, and that it recover compensation for the use of the vessel by the Standard Company subsequent to August 16, 1910, the sum of $50 per day up to February 3, 1911. From this decree the libelant appeals.

W. H. H. Hart, of San Francisco, Cal. (H. W. Hutton, of San Francisco, Cal., of counsel), for appellant.

Ira S. Lillick and James S. Spilman, both of San Francisco, Cal., for appellees.

Before GILBERT, Circuit Judge, and DIETRICH and WOLVERTON, District Judges.

WOLVERTON, District Judge (after stating the facts as above). [1] In the nature of the controversy the first question logically arising for decision is the one suggested by the respondent the Standard Company, namely, that admiralty has not jurisdiction of the cause.

In support of what is alleged touching the nature of the craft, it is shown by the testimony of H. C. Cutting, president of the libelant company, that her dimensions are length 75 feet, beam 30 feet, and draws 4½ feet of water; that she has a superstructure containing machinery, pilot house, galley, messroom, and cabin accommodations for crew. The witness further testifies that she "operates afloat and not otherwise"; that "she was built for the purpose of dredging a ship canal at Richmond and cleaning her out—her occupation is to clean out canals

and harbors and to make fills"—that "since her construction she has never been operated otherwise than afloat"; and that "she is equipped to navigate any place if you have a mind to take her. She has made one ocean voyage." The voyage referred to is one whereby she was taken from San Francisco Bay to Humboldt Bay and returned. The testimony of R. A. Perry, the president of the Standard Company, does not differ materially from that of Cutting as to the nature of the dredger, although he goes more extensively into the manner of her operation while at work.

The case of North American Dredging Co. v. Pacific Mail S. S. Co.,: 185 Fed. 698, 107 C. C. A. 620, decided by this court, is in such close analogy to this, as it pertains to the character of the dredger in controversy, as to be controlling here. Without discussing the cases therefore or attempting to analyze them, we hold that the craft in question is the subject of admiralty jurisdiction.

[2] The next question presented for our decision is whether the respondent the Standard Company was entitled to the possession of the Richmond No. 1 at the time this libel was instituted and the craft was delivered to it by the marshal in pursuance of the bond and the order of the court. This depends upon the construction of the charter party of February 26, 1910. The libel was filed September 2, 1910, and was released to the Standard Company September 13th on its admiralty stipulation and the giving of the bond noted in the statement. The evidence further shows the return of the dredger Oakland was demanded by the Standard Company August 15, 1910. The Richmond Company returned the Oakland the next day, and at the same time made demand upon the Standard Company for the return to it of the Richmond No. 1, all in pursuance of the libelant's understanding of the provisions.of the charter party of February 26, 1910.

Paragraph 8 of the charter party contemplates an extension of the terms of the lease upon the Oakland at the option of the Richmond Company, provided the Standard Company shall not have found any work for the dredger to do, the extension to run until the Richmond Company shall have completed the filling therein designated, "or until the party of the first part (the Standard Company) shall have given the party of the second part (the Richmond Company) fifteen (15) days' notice of the termination of this agreement." This gave the Standard Company the option to terminate the agreement notwithstanding the Richmond Company had not yet completed the filling specified. The ninth paragraph then specifically sets forth how and in what manner the Standard Company might terminate the agreement if during the term or any extension thereof the Standard Company should secure work for the Oakland. By this paragraph the Standard Company was accorded an option either to require the Richmond Company upon giving 15 days' notice to that effect to operate the dredger Oakland 24 hours each day until the specified filling was completed, or to terminate the lease of the dredger Oakland by giving also 15 days' notice of such termination and returning the dredger Richmond No. 1. The Standard Company chose to exercise the option for a termination of the lease of the Oakland, for it gave the notice demanding her return,

but it refused to return the Richmond No. 1 to the Richmond Company. The respondent claims that under the stipulation of this paragraph it yet had another option, either to return the Richmond No. 1 or to keep it and pay an increased rental, namely, $50 per day so long as it desired to use the same. It must be admitted that the stipulation running "or paying the party of the second part fifty (50) dollars per day" lends color to that contention, but when read in connection with paragraph 10 it can be given no such construction. By the latter paragraph the Standard Company is given the right to lease Richmond No. 1, "at any and all periods when not in use or required by the party of the second part until January 1, 1911." Now, it could not well be the intendment of the charter party to give this right of leasing at $800 per month, dependent on the Richmond Company not requiring its use, and at the same time give the Standard Company the right to retain the dredger at any rate on paying to the Richmond Company $50 per day. In other words, an option extending to both parties the right to require and use the dredger at one and the same time is utterly inconsistent and must be harmonized upon some other basis. Considering these conditions together with the general provisions of the several charter parties, and the treatment by the parties thereto of the dredgers Oakland and Richmond No. 1, we are of the opinion, as the District Court decided, that the stipulation for the payment of $50 per day was intended as liquidated damages in case the Richmond was not returned when the possession of the Oakland was demanded. When the Oakland was returned in pursuance of the Standard Company's demand, the Richmond Company was entitled to the return of the Richmond No. 1. Libelant was therefore entitled to the possession of the Richmond No. 1 at the time of the filing of this libel.

It also follows from these considerations that the libelant was entitled to recover $50 per day for the retention of the Richmond No. 1 up until the 3d day of February, 1911, when the boat was tendered back by the Standard Company, and was refused by libelant. It could not recover more than this because it was its duty to accept the dredger, the same being as we find on a careful review of the testimony, in a condition contemplated by the charter party when return should be made.

We are also of opinion, in view of the whole case, that the Standard Company is not entitled to anything as reimbursement for expenses of a caretaker after tender of the Richmond No. 1 to libelant.

[3] The question is presented as to whether the two Atlas gas engines which were installed upon the dredger by the Standard Company after coming into its possession under the charter party became a part of the vessel and were not subject to removal before returning her to the lessor. The record shows that when the Standard Company received possession the dredger was equipped with two Sampson engines of a capacity each of 75 horse power. They had been previously used and needed repairs. Repairs were made by the lessee, but when repaired it was found that they developed in the aggregate 110 to 115 horse power only. To supplement these Sampson gas engines a steam engine was first installed to run the cutter. Later while

the dredger was at work under contract at Eureka, electric motors were installed without removing the gas engines, which did all the work of running both the cutter and the pump. In the meantime the gas engines were not operated at all. Still later, viz., on May 28, 1910, the Standard Company began work upon a contract at Alameda. From that time for a week or perhaps longer the Sampson gas engines were used. In the meantime, however, the Standard Company leased of the Atlas Gas Engine Company an engine and installed it anticipating heavier work under a contract to be undertaken at Walnut Grove. This was installed by bolting it on the deck of the dredger, using some timbers perhaps as a base for the purpose. A little later another Atlas gas engine was leased from the California Reclamation Company and taken from the launch Wink and installed, and the Sampson engines were removed from the dredger and rendered no further service. After the Standard Company completed its work at Walnut Grove, and subsequent to the pendency of the libel, the Atlas gas engines were detached and the Sampson engines reinstalled, the same being put in as good condition as they were first received by the Standard Company, the usual wear and tear excepted, and were in this condition when the dredger was tendered back to the libelant. The testimony upon this subject is very lengthy, entering into the minutest detail; whether material or immaterial, relevant or irrelevant, and without attempting to set it forth here or otherwise analyze it, it suffices that we have examined it with care, and find the above to be reasonably deducible as proper conclusions of fact therefrom.

These Atlas gas engines never became or were the property of the Standard Company, and as a legal conclusion we find that they never became a part of the Richmond No. 1 as equipment or otherwise. They were temporarily installed only to take the place of the Sampson gas engines for the time being, and the Standard Company was entitled to detach them and reinstall the Sampson engines.

Nor do we think that the terms of the respondent's bond require it to return the dredger to libelant with the Atlas gas engines as a part of its equipment. True the bond requires the return of the dredger "in the same condition in which she is now," but it furthermore requires that the respondent "shall abide by and perform the decree of this court," and, the decree of the court being that the Atlas gas engines were not a part of the equipment of the dredger which the respondent was bound to return to the Richmond Company by virtue of the stipulations of the charter party, the bond was satisfied when the conditions of the charter party were complied with.

This leaves but one other question for consideration, which is whether the District Court erred in sustaining the exceptions to the second and fourth claims of damages in the supplemental libel. We think there was no error in that regard. The charter party by legal intendment covers the character of damages sought to be recovered by these claims, when it is construed as we have construed it that the stipulation for the payment of $50 per day was intended as liquidated damages for the wrongful withholding of the dredger from libelant.

These considerations lead to an affirmation of the decree of the District Court, and such will be the order of this court, with costs of appeal to the appellees.